1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ALFRED ABREU,                                    No. CIV S-05-2153-CMK

12               Plaintiff,

13        vs.                                    MEMORANDUM OPINION AND ORDER

14    MICHAEL J. ASTRUE,[1]
      Commissioner of Social Security,

15
                 Defendant.
16
      _____/
17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §

20    405(g).  Pursuant to the consent of the parties, this case is before the undersigned for final

21    decision on plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-motion for

22    summary judgment (Doc. 18).

23    / / /

24
      _____
25          [1]    Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is
      substituted for his predecessor.  The Clerk of the Court is directed to update the docket to reflect
26    the above caption.

                                              1

## I.  BACKGROUND

Plaintiff applied for disability insurance benefits on February 24, 2004, based on disability.  In his application, plaintiff claims that his impairment began on February 17, 2003.  Plaintiff claims his disability consists of: "Spinal condition: post-lamanectomy syndrome: unsuccessful lumbar fusion."   Plaintiff is a United States citizen born October 1, 1950, with a high school education and some college courses.

In his motion for summary judgment, plaintiff offers the following brief background statement:

> . . . Alfred Abreu reached age 55 five months following this decision.  He has three years of college, and worked as a radio announcer in Hawaii for almost 25 years.  He briefly held a couple of other jobs before undergoing the 1995 discectomy and fusion in Honolulu.  Although the record reflects the idea that this surgery helped for two or three years before things deteriorated, he did not work again for five years.  He then held a couple of other jobs for three years before stopping work in 2003 and filing his first claim.

### A.    Summary of the Evidence

Plaintiff has a history of back pain.  He underwent a discectomy at L4-5 and a lumbar fusion in December 1995.  Plaintiff reported improvement after this surgery that lasted for some time.  Recently, however, plaintiff reports a gradual worsening of his low back pain.  A March 2001 x-ray showed post-surgical changes at L4-5 and L5-S1 with sponsylolosthesis, but no spondylolysis.  The x-ray did not show the fusion, however.

In February 2002, plaintiff's treating physician, Don Yokoyama, M.D., reported a long history of back pain with occasional exacerbations.  Plaintiff was also examined by Rudolph Iskanbar, M.D., at this time.  Dr. Iskanbar noted a full range of lumbar spine motion with minimal discomfort.  Straight leg raising was negative.  In October 2002, A. Reza Ehyai, M.D., performed a consultative neurological examination.  Dr. Ehyai reported that, because plaintiff's pain sometimes radiated to the groin, there was a possibility of L5 radiculapathy.  In December 2002, and again in March 2003, plaintiff received epidural steroid injections at L5-S1.

1      In June 2003, a consultative evaluation was performed by Stephen Mann, M.D.,

2  due to plaintiff's complaints of increased back pain.  Dr. Mann reported that x-rays did not show

3  evidence of effusion.  Spinal x-rays were taken in April 2004.  There were some degenerative

4  changes and evidence of narrowing at the L4-5 level, but no signs of bony or disc space

5  abnormalities.  In May 2004, J. Martin, M.D., performed an internal medicine evaluation.  Dr.

6  Martin reported a full range of cervical spine movement.  At this time, plaintiff was able to squat

7  and arise, but with some difficulty.  Plaintiff's gait was normal and seated and supine tension

8  testing was negative bilaterally.

9      **B.      Procedural History**

10      Plaintiff's claim was initially denied.  Following denial of his request for

11  reconsideration, plaintiff requested an administrative hearing, which was held on April 4, 2005,

12  before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.

13      In his April 19, 2005, decision, the ALJ made the following findings:

14      1.    The claimant met the disability insured status requirements for a period of
             disability and Disability Insurance Benefits . . . on February 17, 2003, and
15            continued to meet them through December 31, 2004;

16      2.    The claimant has not engaged in substantial gainful activity since the
             alleged onset of disability;
17
        3.    The claimant's back strain is considered severe based on the requirements
18            in the Regulations . . .;

19      4.    These medically determinable impairments do not meet or medically equal
             one of the listed impairments in the [Listing of Impairments];
20
        5.    The undersigned finds the claimant's allegations regarding his limitations
21            are not totally credible for the reasons set forth in the body of the decision;

22      6.    The claimant has the residual functional capacity to perform light work
             activity which involves occasional postural activities; he requires the
23            opportunity to shift positions several times an hour;

24      7.    The claimant's past relevant work as a radio announcer and a customer
             service representative did not require the performance of work-related
25            activities precluded by his residual functional capacity;

26  / / /

1   8.   The claimant's medically determinable back strain did not prevent the
        claimant from performing his past relevant work; and

2

3   9.   The claimant was not under a disability . . . at any time through the date of
        the decision.

4   Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not

5   entitled to DI or SSI benefits.  It is worth noting that the ALJ concluded his analysis at Step 4 of

6   the sequential evaluation process because he concluded that plaintiff could perform his past

7   relevant work.  Therefore, the ALJ did not address whether plaintiff can do other jobs in the

8   national economy given his residual functional capacity (the Step 5 inquiry).  After the Appeals

9   Council declined review on September 14, 2005, this appeal followed.

10

11                              **II.  STANDARD OF REVIEW**

12               The court reviews the Commissioner's final decision to determine whether it is:

13   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

14   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

15   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520,

16   521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

17   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

18   including both the evidence that supports and detracts from the Commissioner's conclusion,

19   must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986);

20   Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the

21   Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See

22   Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the

23   administrative findings, or if there is conflicting evidence supporting a particular finding, the

24   finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

25   Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

26   one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

1   v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

2   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

3   (9th Cir. 1988).

4

5                               **III.  DISCUSSION**

6           In his motion for summary judgment, plaintiff argues that: (1) the ALJ erred by

7   not giving appropriate weight to the opinion of his treating physician; (2) the ALJ erred in

8   finding that his testimony was not credible; (3) the ALJ erred in finding that his severe

9   impairment is "back strain;" (4) the ALJ misapplied the Listing of Impairments; (5) the ALJ's

10  residual functional capacity assessment must be reversed; and (6) the ALJ erred by not obtaining

11  vocational expert testimony.

12          **A.      Evaluation of Treating Physician's Opinion**

13          The weight given to medical opinions depends in part on whether they are

14  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

15  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

16  professional, who has a greater opportunity to know and observe the patient as an individual,

17  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

18  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

19  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

20  (9th Cir. 1990).

21          In addition to considering its source, to evaluate whether the Commissioner

22  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

23  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

24  uncontradicted opinion of a treating or examining medical professional only for "clear and

25  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

26  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

1   by an examining professional's opinion which is supported by different independent clinical

2   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

3   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

4   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See

5   Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough

6   summary of the facts and conflicting clinical evidence, states her interpretation of the evidence,

7   and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent

8   specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or

9   examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining

10  professional, without other evidence, is insufficient to reject the opinion of a treating or

11  examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to

12  any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d

13  1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported

14  opinion); see also Magallanes, 881 F.2d at 751.

15          As to plaintiff's treating physician, Don Yokoyama, M.D., the ALJ stated:

16          . . . Dr. Yokoyama, a treating physician at MedClinic, reported in
            September 2002 that the claimant's condition waxes and wanes and
17          occasionally makes it difficult for him to sit or stand for prolonged periods
            of time.  He noted that from time to time, it was necessary for the claimant
18          to be off of work because of pain.  Dr. Yokoyama advised a continuation
            of the established medication regimen, regular exercise and a TENS unit.
19          In October 2002, Dr. Yokoyama noted that the claimant could not sit or
            stand for very long nor should he be lifting, bending, stooping, kneeling or
20          squatting when experiencing exacerbations.  He noted that the claimant
            could not really do his job as it was a sedentary occupation and sitting
21          seemed to really worsen the pain.  In August 2004, Dr. Yokoyama
            completed an assessment in which he reported that the claimant's
22          condition was stable.  However, despite observed stability, Dr. Yokoyama
            assessed quite a significant restriction to less than a full range of sedentary
23          work and essentially an inability to work an 8-hour day five days a week.
            Such an assessment included a limitation to lifting/carrying of 5-10
24          pounds occasionally and standing/walking/sitting for less than one hour in
            an 8-hour day.  Additionally, he noted a partial restriction on climbing
25          stairs and ladders and bending and a requirement for rest periods during
            the day.  The undersigned finds Dr. Yokoyama's recent conclusion
26          somewhat ambiguous and not well-supported by objective, clinical or

1
2
3

imaging evidence that would be likely to create such limitations.  Dr.
Yokoyama appears to have accepted the claimant's subjective complaints
as objective fact and his assessment of the claimant's functional
limitations appears exaggerated.  Therefore, the undersigned assigns
minimal weight to such opinion.

4   Plaintiff argues that the ALJ failed to state legally sufficient reasons for rejecting Dr.

5   Yokoyama's August 2004 opinion.[2]  Specifically, plaintiff asserts that "[t]he decision's rejection

6   of the treating physician rested on factual misstatements and speculative nonsense and so

7   constitutes legal error."  As to the ALJ's statement that Dr. Yokoyama's August 2004 opinion is

8   "somewhat ambiguous," plaintiff argues that there "simply is nothing 'ambiguous'" about the

9   opinion.  Plaintiff, however, admits that Dr. Yokoyama's explanation as to the applicability of

10  Listing 1.04 is ambiguous.  Plaintiff also contends that the ALJ's statement that Dr. Yokoyama

11  appears to have accepted plaintiff's subjective complaints as objective fact is belied by Dr.

12  Yokoyama's report.  Finally, plaintiff claims that the ALJ's assessment that Dr. Yokoyama's

13  opinion appears exaggerated is not a specific or legitimate reason for rejecting the opinion.[3]

14              Logically, any one of the reasons given by the ALJ for rejecting Dr. Yokoyama's

15  opinion, if legitimate, is sufficient to reject his opinion.  One reason the ALJ gave for rejecting

16  this opinion was that it is not well-supported by objective evidence.  The court agrees.  While the

17  August 2004 opinion is hand-written and barely legible, it is clear that he relied in large part on

18  plaintiff's subjective statements.  For example, Dr. Yokoyama repeatedly refers to plaintiff's

19  history when stating which medical findings support his assessments.  Also, while the doctor

20  references x-rays as evidence supporting his findings, there is no evidence of any clinical

21  findings observed by Dr. Yokoyama.  Moreover, the x-rays would not have shown signs of pain,

22

23      [2]     According to plaintiff, the August 2004 opinion concerns Dr. Yokoyama's
    assessment of the applicability of Listing 1.04.  The ALJ's finding as to this listing is discussed
    in detail in section III.D.

24

25      [3]     The court observes that plaintiff's argument in this regard is heavy on semantics
    and light on substance.  For example, plaintiff repeatedly challenges the ALJ's word choices but
    does not point to portions of the record demonstrating that the ALJ erred in rejecting Dr.
26  Yokoyama's August 2004 opinion.

1   difficulty sitting for long periods of time, and the like, to which Dr. Yokoyama refers in his

2   assessment.  These kinds of findings would require actual observation and Dr. Yokoyama does

3   not state that any such observations were made.

4           Additionally, it is logical to conclude that, if other doctors' opinions are at odds

5   with Dr. Yokoyama's opinion, this would suggest that Dr. Yokoyama's opinion is not well-

6   supported.  The record reveals that Dr. Martin, who prepared a report in May 2004, actually

7   examined plaintiff.  His report contains the following:

8           Physical examination: In general the claimant was tanned, well developed,
            and appeared the stated age with short "salt & pepper" hair and beard.
9           Grooming was casual and neat with a small earring.  The claimant
            appeared grossly euthymic.  No obvious difficulty getting on/off the
10          examination table or moving about the office was appreciated.  No
            assistive devices.

11

12  Dr. Martin also reported that plaintiff's cooperation was good with "no grimacing or pain

13  vocalization."  He added that the cervical spine showed full movement.  Dr. Martin also

14  observed that the plaintiff "was able to squat and arise from the squatting position with some

15  difficulty" and that "[s]eated and supine sciatic tension testing was negative bilaterally."  Finally,

16  Dr. Martin's examination revealed that plaintiff's hip, knee, and ankle degrees of movement

17  were all normal.  These findings are inconsistent with the limitations opined by Dr. Yokoyama in

18  his August 2004 assessment.[4]

19          Given this record, plaintiff's argument that the ALJ did not properly discount Dr.

20  Yokoyama's August 2004 opinion is not persuasive.  Specifically, the court agrees with the

21  ALJ's assessment that Dr. Yokoyama's opinion is not well-supported by the objective medical

22  evidence.

23  / / /

24

25          [4]     There is nothing in the medical record to suggest that plaintiff's condition
    deteriorated to the extent opined by Dr. Yokoyama in the few months between May and August
26  2004.

1          **B.      Plaintiff's Credibility**

2          The Commissioner determines whether a disability applicant is credible, and the

3   court defers to the Commissioner's discretion if the Commissioner used the proper process and

4   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

5   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

6   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

7   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

8   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

9   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

10  credible must be "clear and convincing."  See id.

11         If there is objective medical evidence of an underlying impairment, the

12  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

13  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

14  341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

15  the symptoms alleged, including aggravating factors, medication, treatment, and functional

16  restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

17  the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

18  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

19  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

20  physician and third-party testimony about the nature, severity, and effect of symptoms.  See

21  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

22         As to plaintiff's credibility, the ALJ first summarized plaintiff's testimony as

23  follows:

24              . . . [T]he claimant testified that he could not sit or stand for 15 minutes as
               it is painful.  He noted that he gets pain in his lower back into the groin
25             and left hip.  He reported that he takes pain relievers and sleeps six hours.
               The claimant testified that on a good day, he walks for one to two miles,
26             stands for 1/2 an hour, sits for 1/2 hour or longer, and lifts 10 pounds or

1   less when bending.  He reported that he eats breakfast, gets minimal
    exercise, plays the guitar, does some cooking and dishes, goes grocery
2   shopping, does minimal housework, and reads a lot (maybe two to three
    books per month both history and politics).  The claimant stated that he
3   uses a heating pad and does some walking and basic Yoga.  He reported
    that a prone position is the most comfortable for five to six hours in an
4   eight-hour day and that alternating from sitting/standing is not enough.
    He reported that he can only bend/squat with great care as it is painful and
5   that he has difficulty reaching over head.  He reported that he takes
    Tylenol-3, various anti-inflammatories and steroid injections.  The
6   claimant testified that back surgery provided relief for two to three years
    and then the pain returned in the low back . . ., left hip, shoulder blades
7   and left groin.  He reported that he is fatigued during the day, that arthritis
    in his right hand limits grasping and the making of a fist, and that his pain
8   rating is never lower than 5 or 6 [out of 10].

9   The ALJ then addressed plaintiff's credibility and stated:

10          In evaluating the claimant's subjective complaints and alleged limitations
            it is noted that he is not fully credible.  The record shows that the claimant
11          had prior back surgery and developed complaints of a return of back pain
            after a period of several years.  Despite such a recurrence of pain, the
12          record is largely devoid of any significant radiological and clinical
            findings of neurological deficits.  Straight leg raising has been negative
13          and range of motion is generally full.  Even though the claimant reported
            that he had undergone both discectomy and fusion surgery, radiological
14          findings did not find evidence of prior fusion surgery.  For the most part,
            medication regimens appear to be effective in pain control.  In his
15          testimony, the claimant reported that he sleeps for six to eight hours per
            night, does some cooking, shops, watches TV, reads two to three books of
16          politics and history per month, plays the guitar, and walks a 1/2 mile for
            exercise.  The claimant mostly sees a doctor for medication refills and
17          there is no evidence that he has seen a doctor since the beginning of 2005.
            The undersigned finds that the claimant's allegations do not restrict his
18          ability to perform work-related activities.

19          Plaintiff argues that this analysis is based on misstatements of the evidence.  With

20   respect to the ALJ's statement that the record is devoid of evidence of neurological defects,

21   plaintiff asserts that his is not a credibility factor.  Plaintiff is correct that the absence of

22   objective clinical findings alone is not a proper basis to reject testimony as not credible.

23   However, the ALJ did not rely on the lack of evidence alone.  The ALJ also stated that straight

24   leg raising tests have been negative.  Again, plaintiff argues that this is not a credibility criterion.

25   Plaintiff is incorrect.  The record contains objective evidence showing that plaintiff's straight leg

26   raising tests were, in fact, negative.  This constitutes physical evidence as to the nature of

1  plaintiff's problem.  See id.  The ALJ also stated that plaintiff's medication regimen has been

2  effective in pain control.  Plaintiff responds that this is an "outright canard."  However, plaintiff

3  does not explain how.[5]

4         Finally, plaintiff appears to suggest that facts concerning plaintiff's daily

5  activities are not relevant to the credibility determination.  In this regard, plaintiff argues that

6  there is tension between 20 C.F.R. §§ 404.15762(c) and 404.1529(c)(3)(I).  There is, however,

7  no tension.  The former regulation cautions against reliance on daily activities as evidence of

8  work activity.  The latter states that daily activities are factors which may be considered in

9  evaluating a claimant's symptoms.  In his credibility assessment, the ALJ was not commenting

10  on plaintiff's work activity.  Rather, as allowed under § 404.1529(c)(3)(I), the ALJ considered

11  daily living activities in assessing plaintiff's complaints of symptoms.  See also Smolen, 80 F.3d

12  at 1284.  Here, plaintiff's statement that he walks one to two miles is inconsistent with the level

13  of pain he asserts.

14         For the foregoing reasons, the court concludes that the ALJ did not err in

15  determining that plaintiff's testimony was not fully credible.

16     **C.     Plaintiff's Back Impairment**

17         In order to be entitled to benefits, the plaintiff must have an impairment severe

18  enough to significantly limit the physical or mental ability to do basic work activities.  See 20

19  C.F.R. §§ 404.1520(c), 416.920(c).[6]  In determining whether a claimant's alleged impairment is

20  sufficiently severe to limit the ability to work, the Commissioner must consider the combined

21

22         [5]     Plaintiff's counsel refers the court to a discussion at pages 3 and 4 of his brief.
   That discussion, however, does not reveal how plaintiff reaches the conclusion that the ALJ
23  misstated the evidence as to medication.

24         [6]     Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
   pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25  carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
   appropriately to supervision, co-workers, and usual work situations; and (6) dealing with
26  changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1   effect of all impairments on the ability to function, without regard to whether each impairment

2   alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

3   1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

4   or combination of impairments, can only be found to be non-severe if the evidence establishes a

5   slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

6   Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

7   1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

8   impairment by providing medical evidence consisting of signs, symptoms, and laboratory

9   findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

10   is insufficient.  See id.

11          Plaintiff argues that the ALJ erred in finding at Step 2 of the sequential analysis

12   that plaintiff's only severe impairment is back strain because the phrase "back strain" is not used

13   by any medical source to describe plaintiff's impairment.  This is a semantic argument that does

14   not have bearing on the merits of this case.  What plaintiff appears to really be arguing is that,

15   regardless of what the ALJ called his severe impairment, the ALJ was wrong in concluding that

16   his severe impairment did not preclude plaintiff from performing his past relevant work, which

17   was the basis for denial of benefits at Step 4.  This issue is discussed below.

18          In any event, this issue – description of plaintiff's impairment and a determination

19   of whether it is severe or not – was resolved in plaintiff's favor.  The ALJ concluded that, in fact,

20   plaintiff suffers from a severe impairment.  Therefore, even if the ALJ had called the severe

21   impairment something else, the result would not have been any better for the plaintiff at this step.

22          **D.      Application of the Listing of Impairments**

23          The Social Security Regulations "Listing of Impairments" is comprised of

24   impairments to fifteen categories of body systems that are severe enough to preclude a person

25   from performing gainful activity.  Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990); 20

26   C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they are

1  irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all

2  the requirements of that listing must be met.  Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir.

3  1985).

4          Plaintiff argues that the ALJ misapplied the Listing of Impairments.  Specifically,

5  plaintiff argues that, while the ALJ analyzed his case under Listing 1.04(A), the ALJ erred by

6  not considering the other listings which might apply, as opined by Dr. Yokoyama.  In particular,

7  plaintiff claims that Listings 1.04B, 1.04C, and 1.05B apply.  Plaintiff cites to page 204 of the

8  certified administrative record in support of his contention that Dr. Yokoyama believed that

9  these other listings apply in plaintiff's case.  However, that page of the record, which is a hand-

10 written note dated August 7, 2004, clearly reflects that Dr. Yokoyama only specified Listing

11 "1.04."  He did not mention a specific sub-section or any other listing.  The court cannot find any

12 mention of other specific listings in Dr. Yokoyama's other records.  Moreover, the ALJ stated in

13 the decision that plaintiff's attorney only argued that Listing 1.04(A) applies.  Therefore, the

14 court will limit its analysis to what was argued to the ALJ – the applicability of Listing 1.04(A).

15         Under Listing 1.04(A), individuals with disorders of the spine, such as

16 osteoarthritis and degenerative disc disease, resulting in compromise of a nerve root or the spinal

17 cord and evidence of nerve root compression characterized by neuro-anatomic distribution of

18 pain, limitation on motion of the spine, motor loss accompanied by sensory or reflex loss and, if

19 there is involvement of the lower back, positive straight leg raising test are presumptively

20 disabled.  Because plaintiff's complaints involve his lower back, for Listing 1.04(A) to apply,

21 plaintiff must demonstrate all of the following: (1) evidence of nerve root compression

22 characterized by neuro-anatomic distribution of pain; (2) limitation on motion of the spine; (3)

23 motor loss with sensory reflex loss; and (4) positive straight leg test, both in the supine and

24 seated positions.

25 / / /

26 / / /

13

1          As to Listing 1.04(A), the ALJ stated:

2          The claimant's attorney contends that the severity of the claimant's
           impairment meets the requirements of section 1.04A of the Listing of
3          Impairments. . . . [¶] There is no evidence of significant motor loss related
           to the claimant's back impairment.  Straight leg raising tests have been
4          negative.  The record lacks the necessary sensory loss or reflex loss and
           positive straight leg raising at both supine and sitting positions that are
5          requisite to this section.  Consequently, the undersigned finds that the
           requirements of section 10.4A are not met.

6

7  Regarding the medical evidence, plaintiff merely states: "Plaintiff's medical history presented a

8  serious post-surgical chronic pain condition that either was, or might as well have been,

9  arachnoiditis."  Plaintiff does not discuss straight leg raising test results, sensory loss, motor loss,

10  or evidence of nerve root damage.  The record is clear that plaintiff never tested positive on any

11  straight let raising test.  For this reason alone, the ALJ was correct in concluding that Listing

12  1.04(A) does not apply.

13          **E.      Residual Functional Capacity Finding**

14          Residual functional capacity is what a person "can still do despite [the

15  individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

16  Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

17  "physical and mental capabilities").  Plaintiff argues that the ALJ's residual functional capacity

18  finding must be reversed because it is based on an improper analysis of plaintiff's treating

19  physician's opinion and his credibility.  This argument is unpersuasive because, for the reasons

20  outlined above, the court concludes that the ALJ did not err with respect to either Dr.

21  Yokoyama's opinion or plaintiff's credibility.

22          As to plaintiff's residual functional capacity, the ALJ stated:

23          After a thorough evaluation of the entire record including the claimant's
           allegations regarding his symptoms and limitations, the undersigned finds
24          that the claimant retains the residual functional capacity to perform light
           work activity that involves occasional postural activities.  He requires the
25          opportunity to shift positions several times an hour.

26  / / /

1  After discussing plaintiff's function-by-function capabilities in the context of accepting Dr.

2  Martin's opinion, the ALJ then restated his residual functional capacity assessment:

3           The substantial evidence of record, as noted above, confirms that the
            claimant continues to have problems with residual body pain.  Even with
4           the limitations that the claimant's conditions impose, the record supports
            that he has a functional capacity for light work tasks which involve
5           occasional postural activities and allows for shifts in position several times
            an hour.

6
            Initially, the court notes that the limitation to shifting positions several times an
7
   hour is consistent with plaintiff's testimony that he can sit for 1/2 hour and stand for 1/2 hour.  In
8
   addition, contrary to plaintiff's assertion, "light work" is a common term used to define residual
9
   functional capacity.  "Light work" involves lifting no more than 20 pounds at a time with
10
   frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b)
11
   and 416.967(b).  The evidence supports the conclusion that plaintiff can do light work.
12
            Plaintiff also argues that the ALJ erred by not first considering plaintiff's ability
13
   in each functional area before describing residual functional capacity in terms of exertional
14
   levels of work.  The court disagrees.  Here, the ALJ discussed plaintiff's function-by-function
15
   capabilities in the context of his analysis of Dr. Martin's opinion, which was accepted.
16
   Specifically, the ALJ concluded:
17
            1.    Plaintiff could lift more than 20 pounds at a time and frequently lift/carry
18                 up to 10 pounds;

19          2.    Plaintiff could stand and walk, off and on, for at least six hours in an
                  eight-hour day, but would need to shift positions several times an hour;
20
            3.    Plaintiff could sit for six hours in an eight-hour day, but would again need
21                 to shift positions several times an hour; and

22          4.    Plaintiff could grasp, hold, and turn objects, and could do repetitive hand
                  and finger actions.
23

24  After making these conclusions, based on Dr. Martin's assessment, the ALJ then repeated his

25  residual functional capacity statement.  Therefore, the ALJ complied with Social Security Ruling

26  96-8p in determining plaintiff's residual functional capacity. In particular, the ALJ's analysis is

1  sufficient to determine whether plaintiff can, in fact, perform his past relevant work.  See Reed v.

2  Massanari, 270 F.3d 838, 843 n.2 (9th Cir. 2001).

3        **F.    Vocational Expert Testimony**

4        Plaintiff argues that the ALJ erred at step four of the sequential analysis by not

5  obtaining vocational expert testimony.  Because, as discussed above, the ALJ did not err with

6  respect to his residual functional capacity assessment, which indicated that plaintiff could

7  perform his past relevant work, it was unnecessary to even reach Step 4 of the sequential

8  analysis.  Therefore, the ALJ did not err by not obtaining vocational expert testimony.  Simply

9  put, application of the Medical-Vocational Guidelines or vocational expert testimony was not

10  necessary in this case.

11

12                        **IV.  CONCLUSION**

13        Based on the foregoing, the court concludes that the Commissioner's final

14  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS

15  HEREBY ORDERED that:

16            1.    Plaintiff's motion for summary judgment is denied;

17            2.    Defendant's cross-motion for summary judgment is granted; and

18            3.    The Clerk of the Court is directed to enter judgment and close this file.

19

20  DATED:  February 20, 2007.

21

22                        _____
                          **CRAIG M. KELLISON**
                          UNITED STATES MAGISTRATE JUDGE
23

24

25

26

                              16